United States District Court for the
Eastern District of Missouri
(111 South 10th Street, St. Louis, MO 63102)

RECEIVED
DEC 30 2013
BY MAIL

Ronald Satish Emrit,
Plaintiff (Pro Se)

C.A. No. _____

v.

MOHELA Corporation,
Access Group, Ken-
tucky Higher Education
Student Loan Corporation
(KHESLC), Sallie Mae,
Inc., & Southwest Student
Services Corporation,
Defendants

## COMPLAINT

COMES NOW, the plaintiff Ronald Satish
Emrit, who is bringing forth this cause of
action alleging that all five defendants have
committed "predatory lending" and the intention-
al infliction of emotional distress in addition
to creating an unconscionable contract with an
unfair amount of bargaining power and a lack of
"arm's length negotiations." More specifically, the
contract between the plaintiff and all five de-
fendants is both procedurally and substanti-

②

unconscionable

# I.) NATURE OF THIS ACTION

1.) The plaintiff alleges that companies that provide student loans engage in "predatory lending" because these companies are essentially predicting that all college students will eventually be earning high salaries because of their vast educational background.

2.) These student loan companies engage in predatory lending because they charge high interest rates and engage in amortization of the loan which the plaintiff asserts is a violation of the applicable usury laws.

3.) According to Wikipedia, amortization "is the process by which loan principal decreases over the life of a loan, typically an amortizing loan."

4.) With regards to each mortgage payment that is made (with regards to a promissory note and secured transaction in paying for a house), a portion of the payment is applied towards reducing the principal, and another portion of the payment

(3)

is applied towards paying the interest on the loan." (according to Wikipedia)

5.) According to Wikipedia, "In business, amortization allocates a lump sum amount to different time periods, particularly for loans and other forms of finance, including related interest or other finance charges. Amortization is also applied to capital expenditures of certain assets under accounting rules, particularly intangible assets, in a manner analogous to depreciation."

6.) According to Wikipedia, "In tax law, amortization refers to the cost recovery system for intangible property."

7.) According to Wikipedia, "An amortization schedule, a table detailing each periodic payment on a loan, shows this ratio of principal and interest and demonstrates how a loan's principal amount decreases over time. An amortization schedule can be generated by an amortization calculator. Negative amortization is an amortization schedule where the loan amount actually increases through not paying the full interest."

(4)

## II.) PARTIES TO THIS LITI-GATION

8.) The plaintiff is a disabled, indigent, and unemployed citizen of the state of Rhode Island. The plaintiff's current address is 976 Douglas Ave., 2nd Floor, Providence, RI 02908. Previously, the plaintiff had been a citizen of the state of Maryland at 5108 Cornelias Prospect Drive, Bowie, MD 20720. The plaintiff argues that it does not matter whether or not any of the five defendants has sufficient "minimum contacts" with either the state of Rhode Island or the state of Maryland. In other words, the "long-arm statute" does not apply. Pursuant to the stare decisis/persuasive precedent of International Shoe Co. v. Washington, 326 U.S. 310 (1945), it does not matter whether any of the five defendants has "systemic and continuous" contact with either the state of Rhode Island or the state of Maryland. Pursuant to the stare decisis/persuasive precedent of Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102 (1987), there is no application of the doctrine of "traditional notions of fair play and substantial justice." As such, the purposeful availment does not apply

⑤

and it does not matter if any of the defendants
could be "reasonably haled" into Rhode Island
Superior Court and/or a district court in Maryland.

9.) The first defendant is a student loan provider
which also seems to serve as a collection agency
acting on behalf of the U.S. Department of Educa-
tion. This company is called the Mohela Corporation
and its nerve center and/or principal place of busi-
ness is listed as 633 Spirit Drive in Chester-
field, MO 63005-1243.

10.) The second defendant is another student loan
provider which financed the plaintiff's law school
education as he attended the St. Thomas University
School of Law in Miami Gardens, FL (between
August 1999 and June 2002). The company is
called the Access Group, Inc. and it seems
to have its nerve center and/or principal place
of business (ppb) located at 10 North High
Street, Suite 400, West Chester, PA 19380.

11.) The third defendant is another student loan
provider which seems to be closely related to
the Access Group, i.e. the second-listed defendant.
The name of this corporation is the Kentucky
Higher Education Student Loan Corporation



(KHESLC); this company seems to have its nerve center and/or principal place of business (ppb) located at 10180 Linn Station Road, Suite C 200, Louisville, KY 40223. The company's phone number is listed as (888) 678-4625.

12.) The fourth defendant is a student loan provider which partially helped finance the plaintiff's undergraduate education at Brown University in Providence, R.I. where the plaintiff earned a Bachelor of Arts degree (B.A.) in Biology in 1997. The company's name is Sallie Mae, Inc. and it seems to have its nerve center and/or principal place of business (ppb) located at 12061 Bluemont Way, Reston, VA 20190. The plaintiff had previously joined a class action lawsuit against Sallie Mae and received a nominal payment as a rival claimant with regards to this settlement fund.

13.) The fifth defendant is the final student loan provider named as an adversarial party by the plaintiff in this lawsuit. The name of this firm is the Southwest Student Services Corporation and it has its nerve center and/or principal place of business listed at 1555 North Fiesta Boulevard, Gilbert, AZ 85233. Its phone



number is listed as (480) 461-9830 and its fax number is listed as (480) 824-5899. With regards to Southwest Student Services Corporation, the chairman of the board and chief executive officer (CEO) is Mr. Vince Roig. The president of this corporation is listed as Rich Nickel; the chief financial officer and senior vice president (CFO/SVP) is listed as Mr. Richard J. Chapin; the chief operating officer (COO) and executive vice president (EVP), is listed as Ms. Jane L. Stewart. The vice president is listed as Ms. Kathleen Harris; the company was presumably founded in 1982.

## III) JURISDICTION AND VENUE

14.) According to the Federal Rules of Civil Procedure (F.R.C.P.) 8(a)(1), the plaintiff is required to provide "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;"

15.) Because the court does not already have personal or subject matter jurisdiction, it is necessary to engage in a brief discussion about the court's jurisdiction so that the defendant cannot move to dismiss this case based on procedural grounds in-

8

volving a lack of proper jurisdiction.

16.) Pursuant to U.S.C.A. §1332, the U.S. District Court for the Eastern District of Missouri (as an Article III court) has jurisdiction over this matter because there is full and complete diversity of jurisdiction between the plaintiff and the five defendants. There is diversity of jurisdiction because the plaintiff and the defendant are from different states. More specifically, the plaintiff is from Rhode Island while the five defendants are from the following states: Missouri, Pennsylvania, Kentucky, Virginia, and Arizona (respectively in order).

17.) In addition, a "federal question" arises out of a discussion of Chapter 7 of the U.S. Bankruptcy Code (i.e Title II of U.S.C.A.) and whether or not it is unconstitutional to declare student loans as non-dischargeable under federal bankruptcy law. In addition, the plaintiff had entered into a contract with the U.S. Department of Education (whose Secretary is Arne Duncan) because the U.S. Department of Education provided the plaintiff with loans to pay for the tuition at Brown University, St. Thomas University School of Law, University of Arkansas, University of Memphis, and University of Arizona. As such, the U.S. District Court for the Eastern District of Missouri

has personal, subject matter, exclusive, and original jurisdiction over the issues raised in this complaint.

## IV. STATEMENT OF FACTS

18.) In August of 1993, the plaintiff officially began his "four-year journey" at Brown University after he graduated with a 3.96 GPA from Gonzaga College High School off of 19 Eye Street in New Washington, D.C. (off of North Capital Street).

19.) Although the plaintiff was neither the valedictorian nor the salutatorian at Gonzaga High School, he finished ninth in his class and was the top-ranking African-American in the class of 1993.

20.) Upon attending Brown University, the plaintiff had to officially take out a federal Perkins loan in addition to a federal Stafford loan; these loans were initially processed by the Direct Loans division of the U.S. Dept. of Education in Utica, N.Y.

21.) Although the plaintiff is not completely sure he believes that he was also awarded a Pell grant while attending Brown University. Pursuant to the Best Evidence Rule or Original Document Rule of the Federal Rules of Evidence 1002, the original copy



of the plaintiff's Pell grant document (allegedly in possession by the Bursar's Office at Brown University) could be admitted into evidence as "past recollection recorded" and/or a "business records" exception to the hearsay rule enumerated by Federal Rules of Evidence 803. More specifically, hearsay is defined as an "out-of-court statement asserted for the truth of the matter." With regards to using the original version of the Pell grant document as a "business records exception" to the hearsay rule, the applicable case-law/stare decisis is the holding of Palmer v. Hoffman, 318 U.S. 109 (1943) and Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (1930).

22) As an alternative, the original copy (with the plaintiff's properly authenticated original signature) of the plaintiff's supposed Pell grant (possessed by the Brown University Bursar's Office) could be admitted under the res gestae or "catch-all" provision of the hearsay exceptions according to F.R.E. 803.

23) With regards to logical and conditional relevance, the original copy of the plaintiff's Pell grant would tend to prove the material fact that the plaintiff has had significant contributions to his undergraduate tuition payment (to attend Brown University) some of which were loans that had to be paid back while other

11

Contributions were in the form of grants and/or scholar ships (which did not have to be reimbursed).

24.) The probative value of the evidence of the Pell grant is not outweighed by any purported prejudicial effect which the plaintiff argues is non-existent.

25.) With regards to certain public policy considerations the evidence of the original copy of the plaintiff's Pell grant should not be excluded as evidence of subsequent remedial measures, liability insurance settlement negotiations, plea bargaining agreements, etc. Needless to say, the courts want to encourage repair (after accidents) and the courts also want to encourage "out-of-court negotiations" which tend to conserve time and money in addition to judicial resources. As far as liability insurance is concerned, this type of evidence is excluded because the courts want to encourage policy-holders to pay the premiums on insurance policies as liability insurance contracts are not even considered to be interstate commerce pursuant to the black-letter law provisions of the McCarran-Ferguson Act. As such, liability insurance contracts are under the jurisdiction of state law as opposed to federal law. As a notable exception, liability insurance contracts are relevant and admissible only to prove ownership and/or control.



12

26) Furthermore, the evidence of the original copy of the plaintiff's Pell grant is not excluded (because of unfair surprise, cumulative evidence, confusion of the issues, undue delay, etc.

27.) Before he graduated from Gonzaga High School, the plaintiff won a scholarship through the Carl Rowan Project Excellence competition (as he was congratulated by the late Ed Bradley from the syndicated CBS program "60 Minutes.")

28.) The late Carl Rowan was a famous journalist who appeared on "Agronsky & Company" (later to be called "Inside Washington."

29.) Although the plaintiff was offered a full scholarship to attend Washington College on the Eastern Shore of Maryland, the plaintiff "traded in" this full scholarship so that he could receive a partial scholarship to Brown University.

30.) By "exchanging" his award for a partial scholarship to Brown University, the plaintiff helped an underprivileged graduate of Fairmount Heights High School (in a run-down and destitute section of Prince George's County, MD) become the first member of his family to attend a college or university.

13

31.) With regards to his federal Perkins and Stafford loans, the plaintiff submitted a Free Application for Federal Student Aid (FAFSA).

32.) With the advent of the internet (created by a Department of Defense Agency called DARPA, i.e. Defense Advanced Research Projects Agency), the FAFSA applications are now handled online with the Student Aid Report (SAR).

33.) The court can take judicial notice that DARPA is also the agency that created HAARP, i.e. the High Frequency Active Auroral Research Program in Gakona Alaska. Because the internet was offered by DARPA to the general public in the mid- to -late 1990's, the plaintiff did not initiate his FAFSA application online with Brown University.

34.) When taking into account the partial scholarships and grants offered to the plaintiff, his Expected Family Contribution (EFC) was approximately $20,000 notwithstanding the fact that the tuition at Brown University is and was much higher than this approximated $20,000 EFC.

35.) The Paperwork Reduction Act of 1980 was codified as 44 U.S.C. §3501-3521 and enacted as

14

Pub. L. No. 96-511, 94 Stat. 2812. This particu-lar piece of legislation also created (presumably through rules enabling provisions promulgated as ad-ministrative law) the Office of Information and Regulatory Affairs (OIRA) within the Office of Management and Budget (OMB); the "black-letter law" of this legislation also gave power to OIRA to preside over the federal agencies' collection of information from the public and to set up information policies.

36.) As a significant amendment to the original piece of legislation, the Paperwork Reduction Act of 1995 re-affirmed the notion that the authority of OIRA was not limited to agency orders that provide information to the government; Other, OIRA's autho-nity also applied to agency orders that "deal with" providing information to the public.

37.) Because of the Paperwork Reduction Act of 1980 and the Paperwork Reduction Act of 1995, the plaintiff is operating under the assumption that the Bursar's Office at Brown University has scanned all of the plaintiff's loan documents such that there is an electronic version of his federal Perkins and Stafford loans and perhaps an electronic version of the plaint-iff's Pell grant if and only if he was in fact awarded



with a Pellgrant before or during his time at Brown University.

38.) If in fact the Bursar's Office at Brown University has an electronic copy of all of the plaintiff's original loan and grant documents, then the Best Evidence Rule or Original Document Rule does not apply because the original document would be considered an intangible file stored on the hard drive and/or CD/ROM of a Central Processing Unit (CPU).

39.) Needless to say, any information stored as software and/or on the "hard drive" of a computer is considered to be "intangible" specifically because it can not be touched and does not have a "physical component" to it (other than the doped semiconductors which are utilized as p-type and n-type semiconductors in the rectifiers and transistors comprising the integrated circuit wafers which are designed in Silicon Valley, CA by companies such as Intel Pentium).

40.) P-type and n-type semiconductors, rectifiers, amplifiers, and integrated circuits have no value as evidence in a court of law because it is the intangible information stored within these microchips which is valuable as evidence (notwithstanding the fact that binary code and Boolean algebra is also useless in a court of law

(16)

because the reasonable person does not understand bi-
nary code or Boolean Algebra)

41.) The Fair Credit Reporting Act (FCRA) is
monitored and presided over by the Federal Trade
Commission (FTC), i.e. an independent government
agency that has a Bureau of Economics and Bureau
of Consumer Protection.

42.) The Fair Credit Reporting Act applies to all
three credit bureaus, i.e. Experian, Equifax, and
Trans Union.

43.) The court should take judicial notice that the
plaintiff's credit score (with all three credit bur-
eaus) has been damaged because of the fact that the
plaintiff has defaulted on his student loans, i.e. a
form of debt which is non-dischargeable under Chapter
7 of Title 11 of U.S.C.A. (Bankruptcy Code). Needless
to say, all three credit bureaus consider student loan
debt when calculating consumers' credit scores.

44.) As a result of the plaintiff's damaged credit
score, he cannot take out personal or business loans,
he cannot rent an apartment or take out a mortgage
on a house without a co-signer, he cannot buy a car
by taking out a car note, etc.

(17)

45.) In addition, the plaintiff's low credit score has damaged his financial condition because he can not open up a secured or unsecured credit card with a low Annual Percentage Rate (APR).

46.) Because Brown University is an Ivy League institution, it does not offer scholarships to its students (although it does offer grants).

47.) With regards to his attendance at Brown University, Sallie Mae is the only defendant which had provided a loan to the plaintiff; the other defendants provided a loan to the plaintiff for his attendance at law school and MBA programs.

48.) Although the plaintiff briefly attended a graduate program at the University of Memphis (in the fall of 1997), it is unclear as to whether the U.S. Dept. of Education and/or the Mohela Corporation is billing the plaintiff for the time that he spent at this particular institution; the plaintiff was pursuing a Master's Degree in Science (M.S.) in the field of Biology.

49.) As had been mentioned earlier, the plaintiff had attended law school between August of 1999 and

18

June of 2002. The Access Group and the Kentucky Higher Education Student Loan Corporation (KHESLC) are the two defendants that provided the plaintiff with a loan to attend law school at St. Thomas University School of Law in Miami Gardens, FL.

50.) It appears as if the Mohela Corporation may have purchased the plaintiff's debt from the Access Group and KHESLC because the plaintiff currently owes the Mohela Corporation approximately $200,000; it cost the plaintiff approximately $200,000 to attend law school at St. Thomas University School of Law.

51.) Furthermore, it seems as if the Mohela Corporation is a collection agency acting on behalf of the U.S. Dept. of Education because the Mohela Corporation incessantly and continuously sends statements and/or bills to the plaintiff indicating that its agency is an independent contractor for the U.S. Dept. of Education.

52.) In the past, the plaintiff has qualified for an "Economic Hardship" Deferment with regards to his excessive and burdensome loans processed by the U.S. Dept. of Education and/or one of its independent contractors, i.e. the Mohela Corporation, Access Group,

(19)

and/or KHESLC. The plaintiff had also qualified for some type of forbearance.

53.) It is not entirely clear to the plaintiff as to why he no longer qualifies for an "economic hardship" deferment and/or forbearance, but the plaintiff wan to enjoin and/or preclude any of the defendants from filing an in rem, quasi in rem, or in personam action against the plaintiff seeking to garnish his wages, attach property owned by the plaintiff, es tablish a receivership, and/or have a lien or judg- ment levied against the plaintiff.

54.) On or around June of 2005, the plaintiff filed for Chapter 7 bankruptcy at the United States District Court (for the District of Maryland) at 6500 Cherrywood Lane in Greenbelt, MD.

55.) The judge assigned to the case was the Honorabl Judge Nancy Alquist; the trustee assigned to the case was Wendelin Lipp, Esq. of Bethesda, MD.

56.) The plaintiff's debt was not discharged be- cause of the fact that he failed to attend a 341 "meeting of creditors." As had been mentioned earlier student loans are non-dischargeable under bankrupto law as are child support, permanent alimony, alimony

20

pendente lite, and rehabilitative alimony.

57.) On August 12, 2013, a letter had been written to the plaintiff by Mark D. Sammons (clerk) and Denise Smith (deputy clerk) about the plaintiff's bankruptcy case, i.e., Case No. 05-22659 NVA. The letter was regarding a "Notice of Filing in a Closed Case."

58.) On June 1st, 2009, the plaintiff's parental rights had been terminated by Judge Susan Greenhawt of the 17th judicial circuit in Broward County, FL (in Fort Lauderdale). As such, the plaintiff is no longer responsible for paying child support to his ex-wife, i.e. Sabine Jules of Fort Lauderdale, FL.

59.) Notwithstanding the application of the Uniform Interstate Family Support Act (UIFSA), Child Support Recovery Act, and Deadbeat Parents Punishment Act of 1998 (18 U.S.C. § 228), the ruling by Judge Susan Greenhawt indicated that the plaintiff would no longer be held liable for paying child support to his ex-wife.

60.) Notwithstanding the application of the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA), the plaintiff agreed to give custody of his



daughter to his ex-wife because it was in the "best interests of the child."

61.) Nevertheless, the plaintiff briefly attended an MBA program at the University of Arizona Eller College of Business in Tucson, AZ (beginning in August of 2002).

62) Although the plaintiff received a partial scholarship from the University of Arizona, he began to incur debt from the Southwest Student Services Corporation because this company helped to pay the plaintiff's tuition at the University of Arizona.

63.) On or around May of 2003, the plaintiff started attending an MBA program at the University of Arkansas Walton College of Business in Fayetteville, AR (Northwest Arkansas is home to the headquarters of Walmart in Bentonville, AR).

64.) Although the plaintiff received a full and complete scholarship to the University of Arkansas MBA program (at the recommendation of Professors Elizabeth and Gerald Jordan), the plaintiff mysteriously began to incur debt from the Mohela Corporation with regards to his attendance at this MBA program.

65.) In the summer of 2000, the plaintiff attended the "Summer in Spain" program sponsored by St. Thomas University School of Law; the plaintiff stayed at the Hotel Floridablanca in San Lorenzo del Escorial (in the mountains of Madrid) and he took two courses, i.e. International Debtor/Creditor Relations (taught by Professor Richard H.W. Maloy) and Comparative Citizenship (taught by Professor Linda Kelly); Professor Maloy and Professor Kelly were both tenured professors at St. Thomas University School of Law.

66.) In the summer of 2001, the plaintiff attended another "Study Abroad" program which was sponsored by the University of Tulsa School of Law. The "study abroad" program was in Buenos Aires, Argentina where the plaintiff stayed at Hotel Arenales. At this "study abroad" program, the plaintiff studied International Sales, International Business Transactions, and International Health/Human Rights. Among his professors was Prof. Bruce Carolan (who taught Int'l Business Transactions) and the Argentine Prof. Martin Bohmer (who taught Int'l Health/Human Rights). As part of this "study abroad" program, the plaintiff flew to Brazil and spent three day's at Foz du Iguacu (Iguassu Falls).

23

67.) With regards to the plaintiff's attendance at the "study abroad" programs in Madrid, Spain and Buenos Aires, Argentina, the plaintiff communicated with Andres Marrero at the financial aid office at St. Thomas University.

68.) Needless to say, the U.S. Dept. of Education paid for the plaintiff to attend both "study abroad" programs.

69.) Although the plaintiff was offered a partial scholarship to attend the St. Louis University School of Law (in St. Louis, MO where this court is situated), he chose to attend St. Thomas University School of Law because it was in close proximity to a woman named Gicela Garcia; she is the aunt of the plaintiff's for-mer love interest, i.e. Rachel Barreiro Garcia of Las Tunas, Cuba.

70.) With regards to his undergraduate education, the plaintiff also took courses at Morehouse College (in Atlanta, GA) and University of Maryland University College/UMUC (in College Park, MD). At Morehouse, the plaintiff took courses in Cell Biology (including laboratory), Molecular Genetics (including lab), Inorganic Chemistry (including lab), Epidemiology, and Special Topics (taught by Dean Blocker). At Univer-

(24)

sity of Maryland University College (UMUC), the plaintiff took a course in the Behavioral Sciences Department called "Stress and the Social System" (taught by Prof. Pamela Witcher).

## V. COUNT ONE: PREDATORY LENDING

71.) The plaintiff asserts that all five defendants engaged in predatory lending because they made the erroneous assumption that the plaintiff would be earning a high salary after his graduation from Brown University and St. Thomas University School of Law. Since graduating from law school, the plaintiff has failed four bar exams in three different states and the plaintiff's last date of employment was on or around August of 2011 when he earned a meager $7.00 stocking shelves for an Office Depot location in Bowie, MD. Because the plaintiff is indigent, disabled, and unemployed, he cannot afford to pay the principal or interest on any of his loans processed by any of the five defendants.

## VI. COUNT TWO: THE FORMATION OF AN UNCONSCIONABLE CONTRACT

72.) The plaintiff asserts that all five defendants have formed a procedurally and substantively un-

conscionable contract with the plaintiff. By assessing high interest rates which are arguably in violation of usury laws in the banking sector, all five defendants have created a financing agreement with the plaintiff that involves an "unfair amount of bargaining power" in which there were no "arm's length" negotiations. Obviously, the disparate levels of bargaining power is weighted in favor of the five defendants who knowingly and willfully advanced loans to the plaintiff on the premise that he would be earning a high salary upon graduating from Brown University and law school.

## VII.) COUNT THREE: VIOLATION OF THE PLAINTIFF'S DUE PROCESS RIGHTS

73.) Because of the fact that all five defendants seem to be acting on behalf of the U.S Dept. of Education, it can be argued with substantial certainty that all five defendants could be construed and/or broadly interpreted as "state actors" in the form of independent contractors representing the federal government. As such, the plaintiff argues that his procedural and substantive due process rights were violated and/or infringed upon when all of the five defendants allowed the plaintiff's student loans to go into default without providing the plaintiff with

(26)

an adequate notice and hearing. The plaintiff's due process and equal protection rights are inherent in the Fifth and Fourteenth Amendments of the U.S. Constitution.

74.) Because of the misfeasance, malfeasance, and/or nonfeasance of the five defendants (in failing to recognize the plaintiff's equal protection and due process rights by providing him with a notice and hearing before they allowed his loans to go in default) the plaintiff's credit score and/or FICO score is now 605 which was created on September 1, 2012 and provided by Experian, P.O. Box 2002, Allen, TX 75013.

75.) Because the range of possible FICO scores is from 300 to 850, the plaintiff's credit score of 605 is not a good score and the court should take judicial notice of this well-recognized fact.

76.) Nevertheless, The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant



has in good faith exercised any right under the Consumer Credit Protection Act

77.) The Comptroller of the Currency is the federal agency that administers compliance with the law regarding any financial institutions, banks, or credit unions that make credit decisions regarding the Fair Credit Reporting Act (FCRA) and the Consumer Credit Protection Act; the mailing address for this federal agency is Comptroller of the Currency, Customer Assistance Group, 1301 McKinney Street, Suite 3450, Houston, TX 77010 - 9050.

VIII.) COUNT FOUR: INTENTIONAL IN-FLICTION OF EMOTIONAL DISTRESS

78.) The plaintiff argues that the conduct of all five defendants is egregious and "shocks the conscience" of the court. By knowingly and willfully extending high-interest loans to unsuspecting and unweary college students (such as the plaintiff when he started Brown University and law school), the officers and directors of these student loan providers "knew or should have known" (i.e., thereby imposing upon them a "constructive knowledge") that they would be creating a future situation involving financial distress of the students taking out the loans (such as

28

the plaintiff). In the plaintiff's case, his student loans are burdensome, onerous, and troubling because the plaintiff anticipates that he will never be able to pay off the excessive amount of approximately $200,000 which he incurred as a result of attending Brown University, St. Thomas University, Morehouse College, University of Maryland University College (UMUC), University of Tulsa, University of Memphis, University of Arizona, and University of Arkansas.

79.) Because the plaintiff would describe the conduct of the five defendants as willful, wanton, and reckless, the plaintiff asserts that he has established a prima facie case for the intentional infliction of emotional distress because of the fact that the conduct of all five defendants is extreme and outrageous.

## IX.) PRAYER FOR RELIEF

WHEREFORE, the plaintiff has filed this cause of action alleging that all five defendants should be held jointly and severally liable (seeking contribution and indemnity from each other) for having committed acts associated with "predatory lending," the formation of unconscionable contracts allegedly in violation of usury laws, the intentional infliction

29

of emotional distress, and the unconstitutional violation of the plaintiff's due process and equal protection rights (by not providing him with a notice and hearing before his loans went into default). In filing this complaint, the plaintiff is requesting that the court provide him with the following relief:

A.) A judgment amount of $15,000,000 (Fifteen million dollars) which would encompass punitive compensatory, actual, presumed, special, and treble damages associated with the commission of "predatory lending," the intentional infliction of emotional distress, and the unconstitutional violation of the plaintiff's due process and equal protection rights (inherent in the Fifth and Fourteenth Amendments of the U.S. Constitution).

B.) This judgment amount of $15,000,000 (fifteen million dollars) would also encompass expectation, reliance, restitution, incidental, and consequential damages available under the common law of contracts for the formation of a procedurally and substantively unconscionable contract which the plaintiff alleges is in violation of federal usury laws applicable to financial institutions, student loan providers, and banks. The concept of an unconscionable contract may also

(30)

invoke a discussion of "quantum meruit" and unjust enrichment.

C.) Because the plaintiff entered into a contract/financing agreement with all five defendants, liquidated damages may be applicable unless the court determines that the plaintiff's contracts with all five defendants are caveat emptor or "buyer beware."

D.) As a final matter, the plaintiff is seeking the equitable remedy of an injunction mandating that all five defendants offer a grant or scholarship (which obviously does not have to be reimbursed) for the plaintiff to attend an MBA or LL.M. program at Southwestern University, Loyola University (in New Orleans), or DePaul University.

Respectfully submitted,

Ronald Satish Emmit

Ronald Satish Emmit
976 Douglas Ave., 2nd Floor
Providence, RI 02908
(401) 272-0547
einsteinrockstar@gmail.com
wilburandcharlotte@gmail.com